## Stevenson v. Washington's Administrator.

(Decided October 25, 1929.)

234

L. SAUNDERS for appellant.

JOHN H. WELCH for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

William Washington, colored, was born in Mercer county near Shakertown and while quite young was sold as a slave and was removed by his new owner from that neighborhood. Some time after he obtained his freedom, as a result of the Civil War, he returned to the vicinity in which he was born and thereafter married a colored woman by the name of Julia Campbell. By her he had two children, Charles Washington and Leana Pope Washington. After they were born, it was discovered that Julia Campbell was a sister of William Washington and they immediately agreed to and did permanently separate. Following that separation William Washington began to visit Kate Crutcher, a colored woman of the same neighborhood, and on the 17th day of December, 1885, they were legally married.

They first took up their abode as tenants of one Mr. Smith, upon whose farm they resided for a couple of years or more, and then moved upon the farm of a Mr. Champion, where they resided for possibly the same length of time, and they thereafter alternated between the farms of Smith and Champion for a period of as much as or more than ten years, when Kate, the wife, died, and her surviving husband then moved across the Kentucky river into Jessamine county with four children, the oldest of whom was the appellant, Lilly Stevenson, and the family resided with his mother-in-law, who was then named Martha Taylor, for about three years, after which he moved into a residence in the same county located but a few hundred yards from that of his mother-in-law. The names of the three other children were Bessie Washington, Mary Washington, and George Washington. Mary married a colored man by the name of Wade, and she is

now dead, survived by children. Bessie married a colored man by the name of Yates, and in 1924, the only son, George Washington, died single and without issue, he never having married.

George Washington was a soldier in the World War, and had procured from the Government a policy on his life in the sum of $10,000, payable to his estate. At the death of George, the Wade children and Bessie Yates lived in the old neighborhood where he died; but Lilly, the appellant, when about 16 years of age, married a colored man by the name of Lightfoot, and, after he died, leaving one child, she married another colored man by the name of Stevenson, and took up her abode in the city of Paris, where she was and had been living for some time when her brother, George, died. She was not notified of the death of George, who predeceased his sister, Mary, and she did not learn of it for a considerable while thereafter. In the meantime the administrator of George collected the present value of the policy, amounting to something more than $8,000, and paid half of it to Bessie Yates and was intending to pay the other half to the guardian of the Wade children, when appellant learned of the situation and asserted claim to one-third of the fund derived from the policy; whereupon the administrator of George brought this action to settle the estate of his decedent, and appellant was made a party thereto.

She answered, setting up her claim to one-third of the proceeds of the policy, and her right to collect it was contested by Bessie Yates, the administrator, and by the Wade children, upon the ground that appellant was an illegitimate child of Kate Crutcher and was born before her marriage with William Washington, and that the latter was not her father. Proper pleadings made the issues, and, upon final submission, upon the evidence taken by all parties, the court adjudged: ''That the defendant, Lilly Stevenson, was not the daughter of William Washington, deceased, who was the father of the decedent, George Washington, but was an illegitimate child of Kate Crutcher, who after the birth of said defendant, Lilly Stevenson, married William Washington.'' From that finding of fact the court adjudged that appellant was not entitled to inherit any portion of the estate of her deceased brother, George Washington, and her claim to any portion thereof was dismissed, to reverse which she prosecutes this appeal.

Prior to July 3, 1893, the only statute in this commonwealth upon the subject of inheritance by, or transmission of an inheritance through, bastards, was section 5 of chapter 31, p. 482, of the General Statutes of Kentucky, Edition of 1888, and which had been in existence for a long time, since it also appears in identically the same language in volume I of the Revised Statutes (Stanton), Edition of 1867, on page 421, and as it appears in both volumes referred to, it reads: "Bastards shall be capable of inheriting and transmitting an inheritance, on the part of or to the mother, and bastards of the same mother shall be capable of inheriting and transmitting an inheritance, on the part of each other, as if such bastards were born in lawful wedlock of the same parents." Under its plain wording, this court, in the cases of Scroggin v. Allan, 2 Dana, 363, Remmington v. Lewis, 8 B. Mon. 606, and Allen v. Ramsey's Heirs, 1 Metc. 635, recognized the right of a bastard under the statutes to inherit from its mother and the mother to inherit from it and that bastard children of the same mother might inherit from each other "as if such bastards were born in lawful wedlock of the same parents." But it was never held, nor could it logically be done, that under that statute a bastard child could inherit from its legitimate half brother or sister, or that the latter could inherit from him.

At the first session of the Legislature convening after the adoption of our present Constitution, and on July 3, 1893, there was enacted chapter 251 of the Session Acts of that year, page 1377, which was "An act in relation to descent and distribution, and entitled 'Descent and Distribution.'" Section 5 of that act is our present section 1397 of the 1922 Edition of Carroll's Kentucky Statutes, reading: "The estate of bastards shall descend and be distributed in the same manner as that of persons born in lawful wedlock; except that the inheritance shall go to the mother and her kindred; and bastards shall be capable of inheriting from their mother and their mother's kindred in the same manner."

It will be perceived that the latter statute is materially different from the one first hereinbefore inserted. It expressly prescribes, not only that bastard children shall be capable of inheriting from their mother, but also from "Their mother's kindred in the same manner." The change in the statute was not overlooked by the learned compiler, Judge Carroll, and at the end of the

cited cases under section 1397, supra, this appears: "Note that this section is different from the general statutes." The language of section 1397, which is our present one upon the subject, makes it perfectly plain that a bastard may not only inherit from his mother, but that he may inherit from his mother's kindred; but, whether that applies to ascending kindred, or collaterals, we need not now determine, since it is patent that it does apply as between children of the same mother whether legitimate or illegitimate, except that the statute with reference to children of half blood obtaining only half as much as those of whole blood would apply to bastard half brothers and sisters the same as legitimate half brothers and sisters. We therefore conclude that, in any event, appellant was entitled to inherit one-fifth of the net proceeds of the policy, even though it be conceded that she was illegitimate, and which brings us to a consideration of the testimony on that issue.

It could serve no useful purpose to give a detailed statement of the testimony of each witness bearing upon the question of appellant's legitimacy. A number of witnesses, some of whom were not colored, and one of whom, Mr. Smith, testified that appellant was born after the marriage of her father and mother and while her parents were living as tenants on his farm. Mrs. Champion testified that, when the Washington family moved upon the farm of her husband, Lilly was quite a small girl, and a number of colored people, one of whom served as nurse for Lilly when she was a baby, testified to the same thing. Almost every one who testified in the case said that William Washington called appellant "daughter," and that he treated her exactly as he did his other three children after they were born. He sent her to school as he did the others, and she assisted her mother in looking after her brothers and sisters as they were born, following her birth, and, in short, there was absolutely no difference between the recognition of the parentage of appellant by William Washington and that of his other three children by Kate Crutcher.

It is true that Bessie Yates, and some other witnesses introduced by her, testified that William Washington referred to appellant only as "Lilly" and not as "daughter," but they were bound to and did admit that he exhibited as much care, attention, and affection for Lilly as he did to or for the other three children. Appellant testified that her mother kept a record of the date of

the marriage of her parents and of the births of her children, and which was at her father's house when she left it and later removed from that vicinity to Lexington with her first husband, Lightfoot. She testified that there appeared on the book the exact date of the marriage of her parents as shown by the records of the county court clerk's office of Mercer county, and that it also showed that she (appellant) was born as a result of that marriage in August, 1886. The explanation by Bessie Yates of what became of that book containing such entries is greatly suspicious and somewhat amusing. After this controversy arose, she told appellant (and which she admitted in her testimony) that Wade, the surviving husband of her sister, Mary, had the book, and that he had torn from it the leaves upon which the entries appeared. But Wäde claimed that Bessie Yates had custody of that record, and both of them claimed that in some mysterious way the book had been denuded of the family record, and that thus emasculated it had entirely disappeared, and all of which happened after this controversy arose, and which, we repeat, is itself a most potent circumstance corroborating appellant and that of her witnesses as to her birth after the marriage of her parents. We therefore conclude that the evidence largely preponderates that appellant was born in lawful wedlock and is the legitimate child of William Washington and Kate Crutcher and the full sister of George Washington, the deceased soldier.

But, if the evidence was less convincing upon that issue, then the strong presumption prevailing in the law in favor of legitimacy would be amply sufficient to tip the scales in favor of appellant's contention in this legal controversy. The general rule of law applying to presumptions of legitimacy is thus stated in 7 C. J. 940, sec. 5: "A child is presumed to be legitimate until the contrary is shown. While the question of legitimacy has most frequently arisen when marriage was claimed or proved and the nonaccess of the husband or the validity of the marriage was at issue, the presumption of legitimacy is not limited to cases involving those questions. It has a wider application and applies to every case where the question is at issue. If the former marriage is necessary to sustain the presumption, it will be assumed until contrary proof is given. In case of conflicting presumption, that in favor of legitimacy will prevail. Moreover, since it is the policy of the law to declare chil-

dren legitimate when it can fairly be done, the presumption of legitimacy is not confined to children born after marriage, where by statute children born before marriage are legitimated by subsequent marriage and recognition.''

Reference to other texts would be superfluous, since the general rule is the same in all Christian countries, and has frequently been recognized and applied by this court. Some of the cases in which it was so done are Strode v. Magowan's Heirs, 2 Bush, 621, Cain v. Gray, 146 Ky. 402, 142 S. W. 715, and Stein's Adm'r v. Stein, 106 S. W. 860, 861, 32 Ky. Law Rep. 664. Many other cases to the same effect could be cited by us, but there are none to the contrary. It will be observed that it is stated in the excerpt from Corpus Juris that ''Moreover, since it is the policy of the law to declare children legiti‧ mate when it can fairly be done, the presumption of legitimacy is not confined to children born after marriage, where by statute children born before marriage are legitimated by subsequent marriage and recognition.'' In support of that statement, the learned compiler of the text cites the Stein case, supra, from this court, in which the opinion written by Judge Carroll, states, inter alia: ''The marriage of an unmarried man to an unmarried woman, who has a child born out of lawful wedlock, should create at least some presumption that it was his child, although the presumption is not as strong as when the child is born after marriage.''

We have a statute legitimatizing a bastard child by the subsequent marriage of its parents, which is section 1398 of our present Statutes. Therefore, following the last excerpt from Corpus Juris, and the opinion in the Stein case supporting it, a presumption arises in favor of the legitimacy of appellant, even if she was born before the marriage of her parents, by the very fact of that marriage, unless, perhaps, it was incontrovertedly shown that prior to the marriage and at the period for conception the husband did not and could not have access to the mother. No such fact is shown in this case. On the contrary, William Washington lived for many years. before his marriage with Kate Crutcher in the same neighborhood and visited her for some time before his marriage to her. So that, the case is eminently one for the application of the presumption in favor of appellant's legitimacy, and there is no testimony in this case to overcome that presumption; i. e., if it be true that appellant

240

was born before the marriage of William Washington and Kate Crutcher, there is no testimony to rebut the presumption that William Washington was her father, and, if so, his subsequent marriage to appellant's mother rendered her legitimate under section 1398, supra, of our Statutes.

It is therefore our conclusion that the court erred in finding that appellant was illegitimate and incapable of inheriting any part of the proceeds of her deceased brother's insurance. On the contrary, the judgment should have been that she was the legitimate sister of her deceased brother and of her two sisters and entitled to one-third of the net proceeds of the insurance.

Wherefore the judgment is reversed, with directions to set it aside and to sustain appellant's claim and render a judgment in conformity with the principles of this opinion.